**Affirmed and Memorandum Opinion filed September 2, 2021.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-20-00245-CR

---

## PAUL HOUSTON LAVALLE, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 19-CR-0918**

---

## MEMORANDUM OPINION

Appellant Paul Houston LaValle appeals his third degree felony conviction for tampering with or fabricating physical evidence. In two issues, he challenges the legal sufficiency of the evidence to support his conviction. We affirm.

### BACKGROUND

Following an investigation regarding whether Appellant furnished alcohol to a minor at his house, he was charged in two counts with tampering with or

fabricating physical evidence on October 14, 2018. A four-day trial was held, at which the following evidence was elicited.

Sandy,[1] who was 17 years old in October 2018, testified how she met Appellant and about Appellant's relationship with her and her family. Although Appellant and her mother had been friends for a very long time, Sandy met Appellant when she was 12 or 13 years old. At the time, Sandy and her family lived in Colorado and Appellant, who is an attorney, represented her older sister in a criminal case. When Sandy was 14 years old, she, her mother, her older brother, and her younger sister moved from Colorado to Texas. They lived with Appellant at his house for about a year because they had nowhere else to go. After they moved out of Appellant's home, Sandy's mother started working for Appellant. Sandy and her family continued seeing Appellant "a lot" even after moving out because they "were really close with him and his daughter." Appellant continued helping Sandy and her family by buying food, clothing, and "stuff [they] needed."

Sandy testified that her mother let Appellant watch over Sandy and Sandy's younger sister for "a couple of days" while she was in jail. During Sandy's testimony, the State introduced a "Power of Attorney and Consent to Medical and School Authorities" that Sandy's mother signed on April 17, 2017, which provided in relevant part:

> Know all men by these presents, that we, [Sandy's mother], of Seabrook, Harris County, Texas, hereby make, constitute, and appoint PAUL H. LAVALLE of Kemah, Galveston County, Texas my true and lawful attorney in fact for me and in my name, place, and stead, and for my use and benefit:
>
> To exercise, do, or perform any act, right, power, duty, or obligation whatsoever that I now have or may acquire the legal right, power, or capacity to exercise, do, or perform in connection with,

---

[1] To protect their identity, we refer to minors using fictitious names.

2

arising out of, or relating to my children; [Sandy], a girl, born on . . . 2001, and [Sandy's younger sister], a girl born on . . . 2005.

My said attorney in fact is authorized to enroll my said children into school and to grant permission to allow participation in sports and any other extracurricular activities;

To authorize medical treatment and hospitalization of my children.

To do whatever, in the judgment of my attorney in fact, would be in the best interest of my children.

The rights, powers, and authority of said attorney in fact to exercise any and all of the rights and powers herein granted shall commence and be in full force and effect on even date herewith, and such rights, powers, and authority shall remain in force and effect until such time as this power is revoked by revocation entered of record in the office of the County Clerk of Harris County, Texas.

Sandy testified that on occasion she drank alcohol at Appellant's home. Her mother gave her permission to drink alcohol a few times and other times, when her mother was not present, Appellant gave Sandy permission to drink. Sandy testified that she drank alcohol on about 20 occasions at Appellant's house.

At some point, Appellant and Sandy had a "falling out" and their friendship ended. Sandy testified that she stopped talking to Appellant "for a while when [her] mom stopped talking to him." Sandy and her family lost their home in 2018, and Sandy moved in with her friend Deborah and Deborah's mother. During that time, Sandy and her mother did not communicate all the time. Sandy testified she "was in a really low point" and reached out to Appellant. He took her shopping, bought her food, and "just h[u]ng out" with her and his eight-year-old daughter Heidi.

In September 2018, Sandy and Appellant watched a movie at his house and Appellant allowed her to drink alcohol that evening. He told Sandy she could

invite a friend, so Sandy posted a video of her drinking alcohol on Snapchat.[2] The video was played for the jury and showed several liquor bottles in Appellant's pantry as well as Sandy drinking from a red Solo plastic cup. The video was captioned, "Who's trying to pull up?" Sandy's mother saw the video and called the police. When police officers arrived at Appellant's home, they talked to Sandy alone. She lied to the officers that she had not been drinking because she was "scared of consequences" and did not want Appellant to get in trouble. She told the police that her mother was crazy, she did not live with her mother, and she did not know why her mother was bothering her. Although no one got in trouble that night, the officers took Sandy home.

A few weeks later on October 13, 2018, Appellant, Heidi, Sandy, and her 17-year-old friend Deborah went to Fun House in the afternoon.[3] They left Fun House around 5 p.m. to go to the store because Sandy told Appellant she needed a new phone. After leaving the phone store, they went to Appellant's house. Sandy testified that she and Deborah made drinks "right off the bat" within ten minutes of arriving at Appellant's house. Sandy testified that Appellant gave her permission to drink and told Sandy and Deborah to "pick whatever we wanted." Sandy stated that Appellant was in the kitchen when she poured alcoholic drinks for herself and Deborah. Once they started drinking, Appellant showed Sandy a young woman on his Tinder.[4] According to Sandy, Appellant said he invited the girl over and Sandy

---

[2] "Snapchat is a messaging application that allows users to share pictures, videos, and messages that are only available for a short time before they become inaccessible. 'Snaps' can be directed privately to selected contacts or to a semi-public 'story.'" *Igboji v. State*, 607 S.W.3d 157, 161 n.1 (Tex. App.—Houston [14th Dist.] 2020, pet. granted).

[3] Fun House is "an arcade place for kids." "It's just a fun place" with "games and food."

[4] "Tinder is an American geosocial networking and online dating application that allows users to anonymously swipe to like or dislike other users' posted profiles, which generally comprise their photo, a short bio, and a list of their personal interests. Once two users have "matched", they can exchange messages." *See* Tinder (app), Wikipedia,

4

and Deborah were supposed to babysit Heidi and help her with homework.

Sandy testified that Jill, the young woman Appellant had shown her on his Tinder, arrived at the house. To Sandy, she appeared to be in her early twenties. Sandy did not talk to Jill except to introduce herself. At some point, Sandy observed Appellant make Jill a drink "but then they left right after." According to Sandy, Appellant told her that he and Jill "were leaving to go to work or go to the office." Sandy and Deborah stayed with Heidi and helped Heidi with her homework. Later, Detective Alonzo Soza from the Kemah Police Department arrived at Appellant's house to conduct a welfare check. Sandy and Deborah were not arrested that night, but Deborah's mother picked them up and took them home.

Sandy testified that Appellant called her later that same evening to check on her. She testified that Appellant told her he would bring a paper for her to sign "just so he didn't lose his kid." She "felt really bad" and "just wanted to help him by doing what he asked [her] to." She stated she trusted Appellant and he assured her that signing the paper would not get her in trouble. Sandy testified that Appellant's paralegal, Mischa Montgomery, came to Deborah's house with an affidavit for Sandy to sign. Sandy claimed she did not read the affidavit, Montgomery just gave her a pen, Sandy signed the affidavit, and Montgomery left. The affidavit Sandy signed was introduced at trial and provided in relevant part:

> BEFORE ME, the undersigned authority, on this day personally appeared [Sandy], who, being by me duly sworn, stated:
>
> I, [Sandy], am 17 years of age, and am of sound mind and I am capable of making this affidavit.
>
> While I am not 18, I know the difference between right and wrong, the truth and a lie.
>
> On October 13, 2018, I asked to babysit Mr. LaValle's child at

---

https://en.wikipedia.org/wiki/Tinder_(app) (last visited August 2, 2021).

his home in Kemah, Galveston County, Texas. After he left the residence[,] I stupidly made alcoholic drinks for myself and my friend.

I was caught by the Kemah Police. I was told by the police that they knew I had been drinking and that I would go to jail if I did not admit that Mr. LaValle was serving me drinks. I lied and told the police that is what happened.

The truth of the matter is that Mr. LaValle is a very strict person and parent and would never allow me or anyone to drink underage, smoke, do drugs, or break any sort of laws.

I understand that by admitting now that I lied to the police, I may be in more trouble today than I was yesterday, but I was scared and I was not trying to hurt anyone.

I swear and affirm that the foregoing is true and correct to the best of my knowledge and belief.

Sandy testified that she did not make any of the statements in the affidavit and that most of the statements were false. She explained why the statements were false: (1) Sandy did not ask Appellant to babysit Heidi, but Appellant asked Sandy to babysit; (2) Sandy did not make drinks for her and Deborah after Appellant left the house – instead, she made the drinks while Appellant was home in his kitchen, and he saw her pour the drinks; (3) the police did not tell Sandy that she would go to jail if she did not admit Appellant served her drinks; (4) Sandy did not lie when she spoke to the police; and (5) except with regards to his daughter, Appellant is not a strict person who would not allow her to drink underage because he allowed her to "drink on multiple occasions."

Sandy stated that a day or two after signing the affidavit she received a phone call from Detective Soza. She "found out" the affidavit she signed had been submitted to the police and that she "was going to be in trouble for lying to the police." Sandy went to the police with her mother, and Detective Soza showed and read the affidavit to them. Sandy told Detective Soza "[t]hat's clearly not how I

write or talk and I didn't know any of that was said on the paper or I wouldn't have signed it." Sandy testified that 90% of the affidavit was untrue.

Deborah also testified at trial and confirmed much of what occurred on October 13 and 14, 2018, although her testimony differed regarding some details. She testified that Sandy had told her that they could earn money babysitting Appellant's daughter, so Deborah and Sandy drove to Appellant's home where Deborah met Appellant for the first time. When they arrived, Appellant took them and his daughter to play games at Fun House. Later that night, they all stopped at a phone store before returning to Appellant's house. Shortly after arriving at the house, Appellant offered Deborah and Sandy alcohol. Deborah could not "completely remember" whether Appellant or Sandy poured alcoholic drinks for her and Sandy, but she believed that Appellant poured the drinks. Deborah testified that she started watching television while Appellant and Sandy looked at his Tinder.

Thereafter, Jill arrived at Appellant's home; she was one of the young women Appellant was looking at on Tinder. Appellant and Jill talked for 30 to 60 minutes. At some point, Appellant also poured Jill an alcoholic drink. When Appellant and Jill left the house, Deborah and Sandy helped Heidi with her homework and babysat. Approximately 45 minutes later, the police arrived at Appellant's home. Then, Deborah's mother arrived and took Deborah and Sandy home. The next day, Sandy and Appellant talked on the phone. Later that day, a woman came to Deborah's house and talked to Sandy for "a couple of minutes," but Deborah could not hear what they were talking about or see what they were doing.

The State also presented Jill's testimony at trial. She stated that she was 19 years old when she met Appellant through Tinder, although she listed her age as

7

being 20 years old. Jill and Appellant first texted each other before meeting in person at his home on October 13, 2018. She testified that she went to his home to sign paperwork because Appellant was supposed to represent her at a criminal hearing the next day. She testified that Appellant, "his daughter, the two girls [Deborah and Sandy] . . . and his paralegal were at the house." Jill stated she did not stay very long at Appellant's house—"[p]robably a couple of hours" to do paperwork. While she was there, Appellant made her one alcoholic drink, but she did not see Sandy and Deborah drinking. When Appellant and Jill left the house, they went to eat at a restaurant and also went to Appellant's office.

The next day, Appellant called Jill and asked her if she could sign an affidavit for him. She agreed and went to Appellant's house. Appellant, Montgomery, and another person were at the house when she arrived. Jill talked to Appellant "[j]ust in general about what was going on." She read the affidavit and then signed it. The affidavit was introduced at trial and provided in relevant part:

> BEFORE ME, the undersigned authority, on this day personally appeared [Jill], who, being by me duly sworn, stated:
>
> I, [Jill], am over the age of 18 years, and am of sound mind and I am capable of making this affidavit. My cell phone number is . . . .
>
> On the afternoon and evening of Saturday, October 13, 2018, I was at the residence of Mr. Paul LaValle . . . .
>
> Also at the residence was Mr. LaValle, his daughter, [Heidi], a 17 year-old named [Sandy] and her 17 year-old friend/roommate named [Deborah].
>
> I was there for several hours assisting Mr. LaValle with some contract work [sic] his business. During this time, I never left his side and never saw him serve alcoholic beverages to anyone, nor did I see the two teenage girls drinking alcohol or under the influence of alcohol.
>
> Mr. LaValle and I were required to travel to his office for 1.5-2 hours to finish our work project.

8

I heard him tell his child that she would be coming with us and the other girls would be going home. However, the child wanted to stay home and the teenagers offered to babysit.

We left the residence and were extremely disturbed when we returned home and found out what the teenage girls had done.

I swear and affirm that the foregoing is true and correct to the best of my knowledge and belief.

Jill testified that most of the statements in the affidavit were true. She testified the statement that she never saw Appellant serve alcoholic beverages to anyone was untrue because he served her alcohol. Although she acknowledged the statement was untrue, she also stated that she thought at the time she signed the affidavit that the statement did not relate to her but that it related to Sandy and Deborah because "that's who the police were investigating."

The jury also heard from Montgomery, who testified that Appellant called her in the early afternoon on October 14, 2018, and asked her to come to his house. When she arrived, Appellant asked her to draft affidavits for Sandy and Jill. Montgomery drafted the two affidavits based on information Appellant provided to her. Within an hour, Jill came to Appellant's house; Jill "actually read" and signed the affidavit, Jill provided her identification to Montgomery, and Montgomery notarized the affidavit. That same evening, Montgomery went to Deborah's house to have Sandy sign the affidavit. Montgomery testified that Sandy answered the door. Montgomery testified that she asked Sandy to read the affidavit "and asked her if everything was the facts as stated in the affidavit to her knowledge. [Sandy] said yes and she went ahead and signed it and [Montgomery] notarized it."

Finally, the State presented testimony from Detective Soza who went to Appellant's home after he received a welfare concern call regarding the "October 13th incident." Although it appears that Detective Soza agreed (during the State's questioning) that he received the service call to conduct a welfare check at

Appellant's house in the evening of October 14, 2018, it is evident from the record as a whole that Detective Soza went to Appellant's house to respond to a welfare concern the evening of October 13, 2018. After the service call, Detective Soza started investigating whether the offense of furnishing alcohol to a minor had been committed with regard to Sandy and Deborah at Appellant's house. Detective Soza testified he considered Jill to be a witness and Appellant to be "the subject or the suspect" in his pending investigation. Detective Soza called Appellant and left him messages to inform him that he was being investigated for a potential charge of furnishing alcohol to a minor. When Detective Soza first spoke to Appellant, Appellant asked him if he had received a package from Appellant's attorney. At that point, Detective Soza had not received anything; but later, he received affidavits signed by Sandy and Jill.

Detective Soza testified that affidavits like the ones from Sandy and Jill are important to his investigation regarding whether the offense of furnishing alcohol to a minor had been committed because they can affect the outcome of the investigation. He explained that such affidavits "could cease the investigation," "could take time away of the entire investigation as a whole or steer it in a complete[ly] different direction." He stated that it is uncommon to receive "affidavits from the actual suspect of the investigation." When Detective Soza spoke to Sandy and Jill about their affidavits, he "was told by both parties that there was [sic] items listed in those affidavits that were not true." He explained that because the affidavits were signed and notarized, he considered them "to be full and legal documents" and his investigation shifted into a new direction. He explained that when he is "presented with records in a pending criminal investigation that contain[] statements in them that are not true or that [he] believe[s] to not be true," that "would be considered tampering."

10

After Detective Soza received the affidavits, he scheduled an in-person interview with Appellant and his attorney. Appellant came to the Kemah Police Department with his attorney and spoke with Detective Soza. According to Detective Soza, Appellant stated he prepared the two affidavits based on statements Sandy and Jill made to him. With regard to Jill, Detective Soza testified that Appellant "mentioned that she was upset because she was no longer going to receive or she was under the impression she was going to receive free legal representation with a current case that she had pending in another county." And regarding Sandy, Appellant's "explanations were in brief that Sandy didn't want to get in trouble and so she made these statements to him and this is how he prepared the affidavits and that there was mention of alcohol being thrown away so that way she would not be getting in trouble for having the alcohol." Appellant "denied giving alcohol to anyone." Detective Soza's investigation also revealed that Kemah police had been dispatched to Appellant's house about a month earlier for a welfare check involving alcohol consumption by Sandy.

After hearing the evidence presented by the parties, the jury found Appellant guilty as charged in both counts. The trial court placed Appellant on community supervision for five years on both counts. Appellant filed a timely notice of appeal.

ANALYSIS

In two issues, Appellant challenges the legal sufficiency of the evidence to support his conviction for tampering with or fabricating physical evidence.

## I. Standard of Review and Governing Law

Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020). We view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted. *Stahmann*, 602 S.W.3d at 577. The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses. *Id*. The jury may choose to believe or disbelieve all or part of a witness's testimony, and we presume the jury resolved any conflicts in the evidence in favor of the prevailing party. *Thomas v. State*, 444 S.W.3d 4, 8, 10 (Tex. Crim. App. 2014); *Green v. State*, 607 S.W.3d 147, 152 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial. *Stahmann*, 602 S.W.3d at 577. "Each fact need not point directly and independently to the appellant's guilt so long as the cumulative effect of all incriminating facts is sufficient to support the conviction." *Davis v. State*, 586 S.W.3d 586, 589 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd).

As applicable in this case, a person commits the third degree felony offense of tampering with or fabricating physical evidence if, (1) knowing that an investigation is in progress; (2) he makes, presents, or uses a thing with knowledge of its falsity; and (3) acts with the intent to affect the course or outcome of the investigation. *See* Tex. Penal Code Ann. § 37.09(a)(2); *Wilson v. State*, 311 S.W.3d 452, 464 (Tex. Crim. App. 2010). The purpose of section 37.09 "is to maintain the honesty, integrity, and reliability of the justice system" and to prohibit anyone from "creating, destroying, forging, altering or otherwise tampering with evidence that may be used in an official investigation or judicial proceeding." *Wilson*, 311 S.W.3d at 458 (citations omitted).

## II.     Tampering with or Fabricating Physical Evidence Count I

In his first issue, Appellant argues the evidence is legally insufficient to support his conviction under count I of the indictment[5] because the unrevoked power of attorney Sandy's mother signed in 2017 gave him the right to act *in loco parentis* and serve Sandy alcohol, so that Appellant's conduct of furnishing Sandy alcohol was not a crime and he could not have known that an investigation was pending.   In that regard, Appellant argues that "[b]ecause it is a defense to a prosecution for furnishing alcohol to a minor if, *inter alia*, the alcohol is furnished by the minor's parent or guardian, the unrevoked power of attorney continued to vest Appellant with the authority to give Sandy permission to consume alcohol acting in his capacity 'in loco parentis.'"   Quoting *Brosky v. State*, 915 S.W.2d 120, 144 (Tex. App.—Fort Worth 1996, pet. ref'd), Appellant claims that "because Appellant could not have been guilty of furnishing alcohol to Sandy, 'for a person's actions to fall within the confines of section 37.09, a separate criminal offense must *already* have been committed; otherwise [Appellant] could not kn[ow] that an investigation . . . is pending.'"

We reject Appellant's contention that the evidence is legally insufficient to establish the element that Appellant had knowledge an investigation was pending or in progress because, without having committed the offense of furnishing alcohol to Sandy, he could not have had knowledge of an investigation that was pending or in progress.   We also find that Appellant misplaces his reliance on *Brosky* to support his contention.

---

[5] Count I states in pertinent part that Appellant, on or about October 14, 2018, "did then and there, knowing that an investigation was in progress, namely furnishing alcohol to a minor intentionally and knowingly make and/or present a document, namely the affidavit of [Sandy], with knowledge of its falsity and with intent to affect the course or outcome of the furnishing alcohol to a minor investigation."

In *Brosky*, the defendant appealed his conviction for engaging in organized criminal activity pursuant to section 71.02 of the Texas Penal Code, arguing "the trial court erred in refusing to instruct the jury on the lesser-included offense of tampering with evidence, a violation of section 37.09 of the Texas Penal Code." In rejecting the defendant's argument, the court of appeals stated:

> Brosky has not provided, nor can we find, any authority for the proposition that the lesser offense of tampering with evidence is included within the proof necessary to establish the offense of engaging in organized criminal activity. Section 71.02 requires that an actor not only agree to participate, but must also perform some overt act in pursuance of an agreement to commit a separate criminal offense. The additional criminal offense, such as murder, need not ever actually take place but instead must be planned. Conversely, it appears to this court that for a person's actions to fall within the confines of section 37.09, a separate criminal offense must already have been committed; otherwise, the actor could not "kn[ow] that an investigation . . . is pending." We reject the argument that conduct that is necessarily conducted after a crime has been committed is a lesser-included offense of engaging in organized criminal activity. We do not find, then, that proof of a violation of section 37.09 is established by proof of the same or less than all the facts required to establish the commission of section 71.02.

*Id*. at 143-44 (internal citations omitted).

The *Brosky* court does not provide analysis for its statement that "it appears to this court that for a person's actions to fall within the confines of section 37.09, a separate criminal offense must already have been committed; otherwise, the actor could not 'kn[ow] that an investigation . . . is pending.'" Additionally, we do not find the *Brosky* court's broad statement persuasive. No language in the statute supports a conclusion that for a defendant's actions to fall within the purview of section 37.09, the evidence must show a separate criminal offense had already been committed because, otherwise, the defendant could not have known that an investigation was pending or in progress.

14

The first element in section 37.09(a)(2) requires a person to know that an investigation or official proceeding is pending or in progress. There is no language adding an additional requirement that "a separate criminal offense must already have been committed" to establish the knowledge element. If the legislature had intended that the investigation or official proceeding must relate to an already committed criminal offense, it would have stated so just as it did in section 37.09(d)(1) for example. *See Stahmann*, 602 S.W.3d at 579 ("If the legislature intended for the mere movement of a physical thing to constitute tampering, it could have said that."). That section specifically provides that a person commits an offense if the person "*knowing that an offense has been committed*, alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in any subsequent investigation of or official proceeding related to the offense." Tex. Pen. Code Ann. § 37.09(d)(1) (emphasis added). We see no support for Appellant's contention in the statutory language.

Further, although no court has expressly addressed Appellant's argument raised here, several courts have affirmed defendants' convictions under section 37.09(a)(2) without evidence that a separate criminal offense had already been committed to establish the defendants' knowledge that an investigation was pending or in progress. *See Waldrop v. State*, 219 S.W.3d 531, 533-38 (Tex. App.—Texarkana 2007, no pet.) (defendant fabricated evidence with the intent to affect the outcome of an investigation into alleged sexual abuse based on defendant's false report of the abuse; defendant, with knowledge of the pending investigation, produced and presented to the police a recording of her daughters' coached, false accounts of the alleged abuse; court of appeals affirmed defendant's conviction under section 37.09(a)(2) even though no separate criminal offense had already been committed); *Waldrop v. State*, No. 06-06-00074-CR, 2007 WL

15

845011, at *1-4 (Tex. App.—Texarkana Mar. 22, 2007, no pet.) (mem. op., not designated for publication) (same); *Arriaga v. State*, 2 S.W.3d 508, 508-512 (Tex. App.—San Antonio 1999, pet. ref'd) (defendant police officer, who investigated a two-car accident, "did intentionally and knowingly make a false police report by falsely writing [a different person's] name as the driver of vehicle number two," with the intent to affect the outcome of a traffic accident investigation; court of appeals affirmed conviction of defendant police officer under section 37.09(a)(2) even though no separate criminal offense had already been committed and the investigation involved a simple traffic accident); *see also Garza v. State*, No. 02-14-00206-CR, 2015 WL 3422467, at *1-8 (Tex. App.—Fort Worth May 28, 2015, pet. ref'd) (mem. op., not designated for publication) (defendant was indicted for tampering with or fabricating evidence pursuant to section 37.09(a)(2) after he submitted two false affidavits in support of his application for post-conviction habeas relief; court of appeals affirmed conviction concluding there was sufficient evidence that defendant made, presented, or used the affidavits with knowledge of their falsity and with the intent to affect the course or outcome of the official proceeding relating to his application for post-conviction habeas relief; there was no separate criminal offense already committed relating to the official proceeding).

Having rejected Appellant's contention that the evidence is legally insufficient to establish Appellant's knowledge that an investigation was pending because, without having committed the offense of furnishing alcohol to Sandy, he could not have had knowledge of a pending investigation, we overrule Appellant's first issue.

## III.    Tampering with or Fabricating Physical Evidence Count II

In his second issue, Appellant asserts there is legally insufficient evidence to support his conviction under count II of the indictment because Detective Soza was

16

not investigating whether Appellant furnished alcohol to Jill at the time Appellant provided Jill's affidavit to Detective Soza and, therefore, "no rational juror could have found beyond a reasonable doubt that Appellant had the conscious desire or objective to affect the course or outcome of an investigation that was not yet in progress or had even been initiated." In that regard, Appellant contends that "the gravamen of an offense under sec. 37.09(a)(2) required Appellant, *inter alia*, to have" (1) "known that an investigation was in progress regarding his allegedly having furnished alcohol to a minor, namely, [Jill];" and (2) "had the intent to affect the course or outcome of that investigation." Appellant claims the jury could not have "found either element was proven beyond a reasonable doubt *when no such investigation was in progress* when Appellant presented [Jill]'s affidavit." (Emphasis in original).

We reject Appellant's argument. The indictment for count II provided in pertinent part that Appellant, on or about October 14, 2018, "did then and there, knowing that an investigation was in progress, namely furnishing alcohol to *a minor*[,] intentionally and knowingly make and/or present a document, namely the affidavit of [Jill], with knowledge of its falsity and with intent to affect the course or outcome of the furnishing alcohol to *a minor* investigation." (Emphasis added).

Contrary to Appellant's assertion, the State did not charge Appellant with knowledge that an investigation was in progress regarding whether he furnished alcohol to Jill. Nor did the State in the indictment allege that Appellant acted with intent to affect the course or outcome of an investigation regarding whether he furnished alcohol to Jill. In fact, the indictment did not specify Jill or any particular minor as the subject of Detective Soza's investigation. Therefore, the State was not required to prove that Appellant (1) knew that an investigation was in progress relating to him furnishing alcohol to Jill, and (2) intended to affect the

17

course or outcome of an investigation regarding Jill. Instead, the State under count II had to prove that Appellant (1) "knowing that an investigation was in progress, namely furnishing alcohol to *a minor*"; (2) intentionally and knowingly made and/or presented Jill's affidavit with knowledge of its falsity; and (3) with "intent to affect the course or outcome of the furnishing alcohol to *a minor* investigation." (Emphasis added).

Further, the focus at trial was not on whether Appellant furnished alcohol to Jill but whether he furnished alcohol to Sandy and Deborah. Detective Soza made clear that his investigation into whether Appellant furnished alcohol to a minor involved two specific minors: Sandy and Deborah. Detective Soza testified so several times. He did not consider Jill to be a victim; rather, he considered her to be a witness in his investigation into whether Sandy and Deborah were furnished alcohol by Appellant. Considering the affidavit Appellant asked Jill to sign, he also considered Jill to only be a witness (and not a victim) in Detective Soza's investigation, or he would not have ensured that one of the statements specifically provided that Jill did not "see the two teenage girls drinking alcohol" — clearly referring to Sandy and Deborah. Additionally, the State highlighted in its closing argument that Detective Soza considered Jill to be a witness and that he investigated whether Appellant furnished alcohol to Sandy and Deborah.

Moreover, based on the record before us, there is legally sufficient evidence that the State proved the offense alleged in count II of the indictment. Appellant knew that he was being investigated for furnishing alcohol to a minor, namely Sandy and Deborah, when he made and/or presented Jill's affidavit to Detective Soza. Detective Soza testified that he had informed Appellant of the investigation. Sandy also had a phone conversation with Appellant on October 13, 2018, in which she informed him what had happened after he and Jill left his house that

18

evening. Appellant told Sandy during this phone call that "he was bringing by a paper for [her] to sign," indicating he knew about the investigation.

At a minimum, the jury could have concluded the statement in Jill's affidavit that she "never saw [Appellant] serve alcoholic beverages to anyone" was not only false but that Appellant knew it was false. Appellant served Jill, who was a minor at the time, an alcoholic beverage. Jill testified that Appellant made her a mixed drink containing vodka and orange juice. Both Deborah and Sandy testified that Appellant poured Jill an alcoholic drink. Thus, the statement that he did not serve alcohol to "anyone" is false. Also, Montgomery drafted Jill's affidavit based on information Appellant provided to her, and he knew the information was false because he was the one who poured Jill an alcoholic beverage.

The evidence further supports a finding that Appellant made and/or presented Jill's affidavit with intent to affect the course or outcome of Detective Soza's investigation into whether Appellant furnished alcohol to Sandy and Deborah on October 13, 2018. Jill was a witness and had no relation to Sandy and Deborah. The jury reasonably could have determined that Appellant made and/or presented Jill's affidavit to Detective Soza in order to corroborate the statements contained in Sandy's affidavit and to corroborate Appellant's denial that he never served alcohol to minors Sandy and Deborah.

Viewed in the light most favorable to the verdict, we conclude that the evidence is sufficient to establish that Appellant committed the offense of tampering with or fabricating physical evidence as alleged in count II of the indictment. Accordingly, we overrule Appellant's second issue.[6]

---

[6] In light of our disposition, we need not address Appellant's assertion that "[i]f this Court concludes that the evidence is legally insufficient to sustain Appellant's conviction as to merely one count but not both, he is entitled to a new punishment hearing on the remaining count."

**CONCLUSION**

We affirm the trial court's judgment.

/s/    Meagan Hassan
Justice

Panel consists of Chief Justice Christopher and Justices Wise and Hassan.
Do Not Publish — Tex. R. App. 47.2(b).